Good morning. May it please the Court, Attorney Thaddeus J. Stauber for the Thyssen-Vornemiese Collection Foundation. Along with Attorney William Barron, who is here on behalf of the Kingdom of Spain, we will allocate the 20 minutes for our appellant argument between us, and I would like to reserve a few minutes. Can you watch the clock then? I will do so, Your Honor. Thank you. We must start this appeal by acknowledging the underlying facts that have impassioned Mr. Casir to pursue this case against Thyssen-Vornemiese and the Kingdom of Spain. And that is that his case arises out of the horrors of World War II and the efforts of the Nazis and their barbaric efforts to discriminate against the Jewish people in Germany and across Europe. And it is that tragic history out of which Mr. Casir's family alleges to have lost a very important Pissarro painting that is now owned by the Thyssen-Vornemiese Foundation in Madrid, Spain, where it has been since the early 1990s. Prior to that, it had been acquired by the Baron Thyssen-Vornemiese as a private individual who acquired it in good faith in 1976. The painting is there, it has been there in Madrid, and it remains there. But what's before this Court is not the merits of Mr. Casir's underlying allegations, but rather the important statutory interpretation question under the Foreign Sovereign Immunity Act of 1976. This Court and the courts across the land, including the Supreme Court, are unequivocally clear that the Foreign Sovereign Immunity Act is the sole basis of jurisdiction over a foreign sovereign. The Thyssen-Vornemiese Foundation fits into the definition of an agency or instrumentality of the Kingdom of Spain. And therefore, we start with the jurisdictional issue, and that is the issue that I'd like to focus this Court on during my time. The key issue before us is, does the Foreign Sovereign Immunity Act expropriation exception, that is 16A3, strip an innocent foreign sovereign, in this case the Thyssen-Vornemiese Foundation and the Kingdom of Spain, due to the acts of an unrelated foreign sovereign, that is the acts of the German government, which Mr. Casir alleged violated international law in the taking or expropriation of this property. We would submit to you that this Court and courts across the land are faced with a case of first impression here as it relates to whether or not an innocent foreign sovereign is subject to jurisdiction, or in other words, if the otherwise sovereign immunity is abrogated or taken away from them due to the acts of a completely unrelated third party, which they had no control over, no relationship with. Statutory interpretation questions are one that this Appellate Court is well versed to handle. And in fact, this Court and other courts have looked at and understood and acknowledged the ambiguity of the Foreign Sovereign Immunity Act and how, and this Court itself has said that the Foreign Sovereign Immunity Act is a statutory maze. It's a labyrinth of confusion that this Court must take a look at. And so we would submit to you that the roadmap for your decision-making process is found comfortably here in the Ninth Circuit Court of Appeals under the In re Philippines case, which had to deal with the successor section of the Foreign Sovereign Immunity Act exception, that is Section 16A4. And in that particular case, this Ninth Circuit found that the plain language of the Foreign Sovereign Immunity Act as it relates to whether or not property here in the United States that has been acquired by succession or inheritance has to have been acquired by the foreign sovereign, which is the defendant in the case. How do you, how do we then look at and try to determine whether or not in the expropriation exception the foreign sovereign, which is the defendant in this case, also has to be the party that took or committed the violation of international law? Well, in re Philippines tell us we look at the plain language first. The plain language is a statutory maze. We take the next step. We look at the purpose and the rationale. We look at the legislative history. What is the purpose and rationale behind the expropriation exception? Excuse me. In 1605A4, though, there was no mention of the foreign state at all, whereas there is a mention in 1605A3. So in 1605A4, it seems there was some need to figure out where the foreign state fit in, whereas 1605A3 is expressed as if the foreign state is engaged in some commercial activity in the United States. It says the foreign state is engaged in some commercial activity in the United States. Yes. But the section before that says a violation of international law. And so the question is who has to have committed that violation of international law? I would submit to you that, in fact, expropriation exception, because it has that the foreign state is engaged or any instrumentality is engaged in a commercial activity, the question is the, the foreign state. What foreign state? The foreign state that violated international law is what I would submit. It starts with A, a foreign state shall not be immune. But I guess my question is the Republic of Philippines starts with the plain language, and the plain language was ambiguous in that case because the foreign state is not in that section at all. But do we have that same ambiguity in A3? It seems like the plain language would answer the question that it's A, foreign state or any foreign state would make sense of that statute of the rights and property taken in violation of international law. Why isn't it just plain on its face? Because it doesn't answer the question of who has to have committed the violation of international law. If we look at the purpose of the violation of international law, if we look at the expropriation purpose, the expropriation section is different from all of the other sections which really go to the restrictive theory under commercial activity. In other words, coming out of the post-World War II history, we did not want to, we, we tightened back and recognized that foreign sovereigns, if they want to engage in commercial activity with the United States, if they're engaging in the broader world and U.S. citizens are reaching out into this broader world, then there are those commercial activities which are not sovereign acts, are acts which the foreign sovereigns will be subject to jurisdiction under. However, the expropriation exception is a slightly different take on that. And the expropriation exception is, I would submit, and in fact, a sort of punishment jurisdiction, a statute that says we look at the law of nations. We hold nations accountable for their acts. And we don't condense violations of international law. By holding the... I'm sorry. No, go ahead. Just to be clear, you're saying that the restrictive theory, which is codified to some extent in 1602, is applicable to 1605A except for 1605A3 is on a different theory? I think that 1605A is on a different theory, yes. I see. Okay. Because it doesn't necessarily deal with the commercial activity. You use commercial activity under 1603A, 1603A3, in order to determine whether or not there are sufficient contacts with the United States. But the expropriation exception comes out of the fact that we are holding accountable foreign states for their violations of international law, their acts against international law, is what is the linchpin for jurisdiction against these states under 1603 expropriation exception. We don't have that here in this particular situation. The Kingdom of Spain, the Ticin Borne Misa, are innocent actors in the ownership of this property. They did not engage in the violation of international law. There is no way that taking jurisdiction over them will further the purpose of the expropriation or the Foreign Sovereign Immunity Act at all. And we must remember that the Foreign Sovereign Immunity Act, which is an abrogation of the common law theory of foreign sovereign immunity, is an abrogation of common law. And so it needs to be very narrowly construed. And narrow construction is one that leads us to the conclusion that you can only hold accountable that person for which has committed the act. Holding the Kingdom accountable, holding the Ticin Borne Misa accountable, on a jurisdictional nature here in the United States, doesn't further the purpose of the rationale of the Foreign Sovereign Immunity Act as a whole, much less the expropriation exception. Well, on the restrictive theory, I suppose if you are holding stolen properties, say, as a private person, that there would certainly be a right of the rightful owner to get it back. Yes. We're not saying that Mr. Casir does not have a right to pursue his case. That's not the issue here. The only issue before this Court on the Foreign Sovereign Immunity Act is whether the Kingdom and the Ticin Borne Misa is subject to restriction of these courts. Mr. Casir has every right to pursue his claim in Spain, where the painting is, and has resided since the early 1990s. There's nothing preventing him from doing that. What we believe the district court did was sort of put the court before the horse and looked at the merits of the case and was really compelled by the emotion of this case, which is hard not to do. But the raising of a Foreign Sovereign Immunity Act defense is not to say that the merits of the case may or may not have any appropriateness or any weight. It's simply to say that the United States recognizes that foreign sovereigns are immune from jurisdiction of our courts except for explicit exceptions. But I have taken ten minutes, and unless there's other questions from me, I'd like to allow Mr. Barron to comment. Thank you. Good morning, Your Honors. I'd like to pick up right where you were, because I think Philippines is indeed the governing case here. I think it's treated in the briefs, but I've read it several times now. And I think there's something about preparing for an appellate argument that sharpens the brain, and I really think there are elements in there, including some just raised in questions now from the bench, worth looking at. And I would suggest the first thing is to take a bit of an aerial view of this otherwise confusing or labyrinthine statute, because I think for purposes of today, it's not that labyrinthine or that problematic. I have copies of the Philippine case, which I find helpful, because it quotes the entirety of 1605. But as we all know, there are seven sections, and only seven. Those are the seven bases on which one can obtain jurisdiction over a sovereign. And I have it right in front of me. Number one is waiver. That's easy. It's not relevant here. But that's an act by the sovereign who's being sued, that that sovereign waived its immunity. Number two is commercial activity in or directly affecting the U.S. or somebody in the U.S. Number three, which is what we're here about today, is the so-called expropriation section, which has two tests. One, property has to be taken in violation of international law. It's silent as to by whom, and that's partly why we're here, because of our very unusual facts. And the second test is that there has to be an impact in the United States, contact by the agency or instrumentality. So two tests in number three, the expropriation section. The much shorter one, number four, was at issue in the Philippines. It has two tests. But, Your Honor, you were quite right. It only mentions the foreign state, but doesn't really mention it at all for two reasons. The two tests are subsumed and nowhere near as wordy, if you will, as the one in section three. Section four deals only with rights to property by succession or gift. But that has to be property in the United States. That's the second test. It doesn't say anything about the sovereignty, but it's the property that has to be in the U.S. for that. But it doesn't say who has to have acquired the property by succession. And, therefore, this Court, in Judge Schroeder's opinion, had to dissect the statute and inserted the words. Acquired by succession by the foreign sovereign being sued. That's the solution that the Philippines reached and which I think governs the same solution here. Number five deals with torts. Torts in the U.S. by the foreign sovereign or outside having a direct effect. Not relevant here, but it might be. There was one question from the bench also that dealt with theft. So we'll come back to that. Number six, second to last, is the arbitration agreement if the foreign sovereign being sued has signed an arbitration agreement and the actions to enforce it. That's, again, done by the sovereign being sued. And number seven, which was added 20 years after everything else, in 1996, I call, and most people call, the torture or terrorism section, which is probably fairly labyrinthine. It's almost as long as the rest of the statute that precedes it. But, in effect, protects, and you have to read almost to the end to realize, it protects only American citizens against acts of foreign torture, terrorism, murder, or other acts of state that, in effect, would violate international law. Now, I'd like to go back to two, three, and four. Two, again, is the commercial activity. Test three is expropriation. And four is rights in property acquired by succession. Those are the three related sections which all deal with how a foreign sovereign, in effect, can acquire property. I've thought long and hard. I couldn't think of another way. It could buy, for example, a painting, a car. That's commercial activity. Seems clear. And if you buy property, and that property is if you add it in the United States, then you come in under number two. Under number four, if a state foreign sovereign acquires property, I guess, either through a will or a succession that somehow it passes to it, it's really not clear to me what succession means in that context. That property, again, has to be in the U.S. But there it is. No sovereign immunity. Philippines makes it clear that the reason is, and it jumps out of the legislative history, is because there a foreign sovereign is acting just like an ordinary private party. All it does is inherit something or acquire it by succession. Same thing is true for commercial activity. If a private sovereign or a foreign sovereign goes out and buys a piece of property or a piece of real estate, it's acting like an ordinary private person, like any of us. That's not a sovereign act. So what about number three, which we're here to talk about? That's the taken in violation of international law. There's only one kind of thing or person or entity that can take property in violation of international law, and that's a sovereign country. Think of it. I can't. None of us in this room can. It's only a sovereign that can violate international law in the first place. That's the law of nations and among nations. So there was no need to put that in there. Clearly had to be done by a sovereign. Now, why didn't Congress foresee the possibility that there might be a sovereign? Today it's Spain, or rather it's a museum that is in the kingdom of Spain, which now finds that that foundation is in possession of property that, by a fluke, was at least here allegedly taken by a different foreign sovereign 50 or 60 years earlier to Germany, and that that now is alleged to come under Subsection 3. We suggest it makes some sense, particularly in light of the statement, logical, well-reasoned statement in the Philippines case where the court made it quite clear. Simple sentence. The FSIA's exceptions focus on actions taken by or against a foreign sovereign. If it's not done by a foreign sovereign, how can that sovereign lose its immunity? It's either acting as a private individual by engaging in commercial activity or doing other actions which have nothing to do with a foreign sovereign, like an arbitration agreement, like buying a piece of property, or it's violating international law, and that's where this is a novel, if you will, change in the prior law of sovereign immunity. Under Subsection 3, you have a violation of international law as one of the tests. You also do, in effect, under Subsection 7, the comparatively new torture or terrorism act. All the rest have to do with the sovereign acting, and that's the point, as in effect a private individual. So Subsection 3, Subsection 7 stand apart, but they still under the Philippines and its logical inclusion of the words that we think must be included here, that there must be an action by the sovereign. Do you want to save some time? Thank you, Your Honor. If you have any questions, I'd be happy to answer them. Otherwise, I'll reserve. Good morning, Your Honors. My name is Stuart Dunwoody, and I represent the appellee Claude Kassirer. Mr. Kassirer regrets that he's unable to be present today due to poor health. Now, we heard about how the FSIA is a maze and complex, and I'll grant that for some parts of it, but the phrase at issue here, taken in violation of international law, isn't complex. It's simple and straightforward, and the Court should give effect to the plain meaning of that phrase without adding additional language into it. Do you mind if I just jump in with a question? You sent us a 28-J letter with the permanent mission of India. Yes, Your Honor. And Justice Thomas suggests that we look not just at the plain language, but at the codification of international law at the time of the FSIA's enactment. Yes. Was there ñ what was the status of international law with respect to what I would think you might call repatriation of artifacts? In other words, in order to read the FSIA as applying to a sovereign that is holding property, artworks that were stolen by someone else in violation of international law, there would have to be some sort of repatriation concept in 1976 when the act was enacted. Do you know what the international law was at that time? I'm not aware of any international law on that point, Your Honor. It's correct that the Supreme Court looked at the restatement second to see what was the common law of foreign relations law in 1976 when the act was enacted and found something in the restatement second concerning this topic. But there's nothing in the restatement second on the issue of immunity, with respect to immunity on the question of takings in violation of international law or this more specialized question that you raise. I think it is correct that up until 1976 that a taking was considered a sovereign act and that ñ and so this was a change in the law. And so in that way, you know, what Congress was ñ the background that Congress was legislating against probably gives less guidance in this case than it would in the permanent mission case where it was legislating against the background of this recognized succession exemption. But I do think that permanent mission of India is an important case for the court to look at as it considers this question because the court there used the two-step process, the first one being looking at the plain language and the statutory text and then second, looking at the purpose of the FSIA. And when you apply that two-step process, then you reach the conclusion that the district court reached. Looking at the statutory text, there's nothing ambiguous about it. It says taken in violation of international law. It's in the passive voice, which means that it doesn't specify who ñ it doesn't limit who does the taking or require any particular person to be doing that. And then going to the second step, the purpose of the FSIA, giving this phrase its plain meaning is consistent with the purposes of the FSIA. And one of those purposes was clearly to give a forum and a remedy ñ not a remedy, but at least create a forum where someone could get a remedy for takings in violation of international law. And, of course, we know that just by reading 1605A3. It's creating the immunity exception so claims can be made. And giving the phrase the construction that we argue for will further that purpose of the FSIA because it allows plaintiffs whose property has been taken in violation of international law a fuller remedy. It allows those claims to be heard. And you heard counsel for the foundation talk about stripping the foreign state of its sovereign immunity. But in looking at this, the court needs to remember that sovereign immunity is a matter of grace and comity. It's not a matter of right, a matter of grace and comity granted by Congress. So the question is, does it make sense for Congress in deciding how to exercise that grace and comity to decide not to allow an immunity exception for a foreign state that holds property that was taken in violation of international law, even if that state didn't do the taking? And the answer is, yes, it certainly does because it furthers this purpose of giving a remedy. But, Counselor, if I'm going to talk about does it make sense, and I'm going to try to interpret then the will of the Congress other than getting out of the plain language of the statute, which is, I think, your better argument, it doesn't make sense. Does it make sense that we would have jurisdiction over something that in the United States when the state that is here is abided by international law? Does it make sense that I would take jurisdiction over states who have clearly abided by the international law and are only here by simple, if you will, interpretation or by looking at the statute and suggesting what it is that I would then have jurisdiction over them? It would seem to me that the statute, when read, does it make sense, would only be that I would take jurisdiction when the citizen is here in the United States who wants to do something about it, and the state who I'm now taking jurisdiction over has done something for failure to abide by the international law rather than simply having dealt in commerce on a general basis, because having dealt in commerce on a general basis would be the first exception, or excuse me, the second exception. Where we are to the third exception, and you're saying does it make sense, that's the problem that I have with your argument is that if I were going to put my own idea in about what Congress would have had to do, I'd have a tough time suggesting that Congress would, on a central basis, say that everybody who has had anything to do with taking property, wherever it is, as long as the citizen sits in this country, that they can automatically bring them here if they do any advertising or if they do any commercial business here. Your Honor, to answer that maybe in two pieces, perhaps I'm wrong in using the term makes sense. I think what I'm really trying to do is respond to the appellant's argument that this is an absurd result that couldn't have been intended, and I think it is true that what we're trying to do is ascertain the meaning of the statute. And what I want to say is that the meaning that we ascribe to the statute serves the purpose of the FSIA. In response to the other part about violation of international law, it's not true that for there to be a basis for jurisdiction under the FSIA that the foreign state, that's the defendant, has to have violated international law. For example, under the commercial activity exception, that's not a violation of international law. And so giving the statute, the construction that the district court gave, is consistent with these other portions of the Act that hold a foreign state liable for its commercial activity because simply holding onto the property under the painting here is a commercial activity. So giving it this interpretation doesn't call into question a sovereign act of Spain or of the Foundation. Could I follow up on that for a moment? Again, Justice Thomas is saying that we should read the text in the context of one of the purposes, which is adoption of the restrictive view of sovereign immunity. How does the plain language interpretation of 1605A3 further the restrictive view? Is holding property taken in violation of international law something that an ordinary person could do? Yes, absolutely, because it's basically under the restrictive theory of sovereign immunity, everything is commercial unless it's sovereign. And sovereign things are things that only a government can do, like imposing taxes, raising an army, regulating a market, that sort of thing. And so certainly private actors can and do hold stolen property, and there's nothing sovereign here about them holding it. Now I'd like to turn to INRI, Republic of Philippines. That doesn't justify reading this limitation, and as Your Honor noted, there are significant differences between 1605A4, which was at issue in that case, and 1605A3, in that 1605A4 doesn't have any requirement of an action by a foreign state that is already in the language for 1605A3. So there was a need in INRI, Republic of Philippines, to read by the foreign state in there so that there would be some connection with the foreign state. What the jurisdictional section of the Foreign Sovereign Immunities Act, Section 1330C, calls transactions or occurrences by the foreign state. But here, 1605A3 already has that requirement of a transaction or occurrence with the U.S. with this requirement that the property at issue either be present in the U.S. in connection with a commercial activity of the foreign state or that it be owned or operated by an agency or instrumentality that is engaged in a commercial activity. So you don't need to read that additional language in to create the action by the foreign state. And another difference with INRI, Republic of Philippines, has to do with the legislative history. The legislative history for 1605A4 supports the limiting language that the court read in in Republic of Philippines. It explicitly states that the exception applies to property that was inherited by the foreign state, and that's quoted by the Republic of Philippines court. But for 1605A3, the statutory history simply repeats the plain language taken in violation of international law. It doesn't suggest any restriction on the scope of that language. It doesn't suggest restricting it to taken by the foreign state. I'd like also to note that the giving effect to the plain language of 1605A3 is consistent with this court's decisions in other FSIA cases, such as the FANUF v. Indonesia and Gates v. Victor Fine Foods cases, both of which in both of which cases the court declined to read additional language, additional requirements into the statute. There's some mention of restatement third in the briefs, and I'd just like to address that briefly. The restatement third isn't a basis for reading additional language into 1605A3 because it doesn't reflect that the drafters considered and rejected the construction that we're arguing for. It's true that the restatement third does say, well, the immunity exception for taken in violation of international law applies to and refers to a taking by the defendant in a foreign state. But it doesn't address and exclude the situation here. I mean, and this is why, of course, you know, it's sort of like dicta in that way, that it's just because it's, you know, until someone grapples with an issue and has it presented to them and decides that there's really no ruling on it. Do you know what the date is of restatement third? Was that something before the 1976 drafters? I don't know the exact date, but I can tell Your Honor it's after 1976. And so restatement second was before. But I think the other reason not to, that restatement third doesn't require reversal, is that there's no reason why this Court should be deferring to the drafters of restatement third on an issue of statutory construction. As Mr. Stauber said, the Court is well-versed in statutory construction. A restatement may be useful in reconciling, you know, conflicting decisions of the common law, but it isn't something, it's not helpful to a court where it's just construing a statute. And it's noteworthy that that's what the Supreme Court did in permanent mission of the U.N. It looked at restatement second to see what light it shed on the common law of foreign relations as it existed in 1976, but it didn't go to restatement third and say, well, what does this tell us about how to answer, how to construe the statute that we have the duty of construing? And as I mentioned, the restatement second just doesn't shed light on this issue here. Mr. Barron for Spain argued that only a state can take property in violation of international law. I certainly will grant that in most cases a state will be the one doing the taking, but there are, and in this case, our contention is that Germany took the property in violation of international law by acting through this appraiser that had to give permission for Lelika Seer to flee Germany with her life. But it's not true that in every case it has to be a state. I mean, there are obligations of international law that can apply to individuals as has come out of the genocide in Yugoslavia. That's certainly been one of the things taught there. Counsel, when I read 1605A3, there is some part of the language there that worries me just a little bit about your argument. As you read that, it says something about the fact that the application of the expropriation exception is appropriate even if the foreign state no longer has the expropriated property in its possession as long as the foreign state or its agency or instrumentality possess any property exchange for the expropriated property. Now, it seems to me that if the Congress would put that in the statute, they would have some, well, that would give you the idea that they were the ones to have expropriated it. I don't believe so, Your Honor. I think that it works. I mean, it doesn't seem to me that if we look at that language, any property exchanged, what we're really looking for is that the state no longer have it, but that they have any property exchanged for the property, that that language would suggest that the one who expropriated the property is the one to whom we ought to find responsibility. Or why talk about that? I think for this reason, as Spain made that argument in its brief and noted that this property exchange language is so that the defendant foreign state can't defeat immunity by transferring the property away upon notice or suspicion of a suit filed against it. And that applies equally in this situation as well, that once the foundation, which didn't take the property in violation of international law, has it, you don't want it to defeat immunity by transferring the property away from it. And it certainly is, so it makes sense in this situation as well as in the situation where the foreign state is, the defendant foreign state is the one that took the property in violation. Well, it seems to me in reading that as the exceptions are laid out among the statute, it seems to me when one talks about commerce and talks about how that might be one of the exceptions, and now we get to this, and now we're talking about the fact that you have given up this property doesn't necessarily avoid this. I'm just trying to understand how one would read the statute to suggest that, any given what we've really said about who can take this property really in this kind of a situation at all, that we read this statute then to suggest this would be an appropriate taking, an appropriate situation. Well, I think the other part, Your Honor, is that this talks about where there is a waiver, where there is no sovereign immunity. It doesn't necessarily have to be absolutely congruent with where there is liability. So that can be part of the answer as well. And the minute that remains, I would like to point out that the other requirement for subject matter jurisdiction of commercial activity, a commercial activity in the U.S., is amply reflected in the record. There's no requirement that that be with respect to the property at issue, but there was, in fact, commercial activity with the property at issue with the painting. And then I'd like to point out on personal jurisdiction that both that and both the issues of personal jurisdiction in case or controversy are not properly before the court because they're not appealable as a collateral order, and there's a 1222B appeal here. The defendants admit that. They say, well, it's appealable under the appellate jurisdiction, but that doesn't apply here because those issues aren't inextricably intertwined with the statutory construction issue. Thank you. Thank you, Your Honor. Very briefly, one, when an absurd result comes out of a plain reading of the statute, you simply don't just follow that result, follow a plain reading of the statute. I think the Court has, in its questions, demonstrated that there is ambiguity, there is a statutory maze here that we have to work ourselves through. And when we do that, we work through the exact process that Judge Thomas did at the Supreme Court. We look at the restatement. We look at commentary. We look at the legislative objective here, and it clearly is to hold accountable under the expropriation exception that state which violates international law, not any state. Otherwise, you end up where we are right here today with a state that has not engaged in any activity. There is no allegations that it has engaged in any unlawful activity, and yet there's an effort here to bring it to the Court here in the United States. The purpose of the Sovereign Immunity Act is not simply to create a forum. We don't need that in this particular case. There is a forum. There is Spain, if Mr. Kucera was to pursue his case. What is just at issue here today before us is whether or not Spain and its agency instrumentality, the Decent Born Amnesia, is subject to jurisdiction of the United States Court under the exception. I'll just plant one more case in the Court's head is the Altman case, which the Senate has taken up. I think that speaks right on point that there is not commercial activity, that it all relates to the issues at hand. There's been no benefit from the expropriation, and so I think we have to have a higher standard for the activity. I'd like to allow Mr. Barron a moment. I'm sorry. Time's expired. Thank you. This case is submitted. Thank you. I deserve a moment, and I really have only a moment for that. Yes. I have 30 seconds. The deal was initially raised by Mr. Conway, but he had to tag in and erase the issue of case or controversy. There is, as you may recall, a pending motion that has been transferred to this panel. And the question is whether that issue, whether there is indeed any dispute between plaintiff and the Kingdom of Spain, put aside the museum, the foundation. There is no allegation that Spain, and the fact is, Spain doesn't claim to own the painting, possess it, does not assert any rights to the painting, and never has. Only the foundation possesses it, owns it, displays it in Madrid. The reason why the case or controversy and the FSIA issue, which is indeed properly before this Court, and Mr. Dunwoody doesn't disagree, is because of the specific requirement of the FSIA in Section 3, also Section 4, that rights in the property involved must be in issue. They are not in issue, as between the plaintiff and the Kingdom of Spain. They are in issue, and the complaint makes that quite clear, only as between plaintiff and the foundation which it has sued, which is my co-defendant, co-appellant here. So they are inexplicably implied. Reading the complaint makes it clear that no such rights are in issue as between plaintiff and the defendant, the Kingdom of Spain. Thank you. Thank you. The case is submitted, and we read your hand.
judges: Nelson, Ikuta, Smith